UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

MICHAEL J. CHEVALIER,                    Case No. 14-CV-4644 (PJS/JSM)

        Plaintiff,

v.                                                              ORDER

SUPPLY TECHNOLOGIES, LLC,

        Defendant.

    Leslie L. Lienemann and Celeste E. Culberth, CULBERTH & LIENEMANN, LLP, for plaintiff.

    Cintra B. McArdle and Richard P. McArdle, SEYFARTH SHAW LLP; and Joseph G. Schmitt, NILAN JOHNSON LEWIS, for defendant.

    Plaintiff Michael Chevalier sued defendant Supply Technologies, LLC ("Supply Technologies"), his former employer, alleging that Supply Technologies fired him on account of disability.  Specifically, Chevalier alleges that Supply Technologies fired him because he suffered a heart attack and then, 20 months later, suffered a transient ischemic attack ("TIA").  Supply Technologies denies Chevalier's allegation and says that it fired Chevalier because he performed poorly as a sales representative.

    Supply Technologies now moves for summary judgment.  Because a reasonable jury could not find that Supply Technologies' explanation for firing Chevalier is pretextual, the Court grants the motion for summary judgment.

## I.  BACKGROUND

Supply Technologies sells components (such as bolts, screws, and other

fasteners) used in manufacturing buses, farm equipment, and other machines.  ECF

No. 27-1 [Chevalier Dep.] at 50:16-52:7.  In July 2010, Supply Technologies hired

Chevalier to work as an account executive in its Minneapolis office.  *Id.* at 73:16-74:16.

Supply Technologies agreed to pay Chevalier an annual salary of $80,000, making him

the highest-paid account executive reporting to general sales manager Brian Latal.  ECF

No. 29 [Latal Decl.] ¶¶ 2, 5, 9.

Supply Technologies told Chevalier over and over again—before it hired him

and then after it hired him—that bringing in new business was his primary

responsibility.  When Chevalier was negotiating with Supply Technologies, Latal and

others told him that his main duties would be to maintain existing accounts and bring

in new business, both by attracting new customers and by persuading existing

customers to increase their orders.  The importance of bringing in new business was

even reflected in the human-resources document describing Chevalier's position.

Chevalier Dep. 55:6-58:7, 67:16-68:4, 108:1-112:8; ECF No. 27-3.

After Chevalier was hired, he was required to submit weekly sales reports to

Latal and to participate in regular conference calls with director of sales Ron Galla (and

then with director of sales Don Slickman, after Slickman replaced Galla).  Chevalier

Dep. 120:21-121:13, 126:21-130:1, 177:16-19; ECF No. 27-23 [Slickman Dep.] at 43:17-44:1.

A major purpose of these reports and conference calls was to discuss Chevalier's

success in generating new business.  Latal repeatedly told Chevalier that generating

new business had to be Chevalier's "number one priority."  Chevalier Dep. 140:22-141:2,

157:8-24.

It quickly became apparent, however, that there was a large gap between the

amount of new business that Supply Technologies expected Chevalier to generate and

the amount of new business that Chevalier was able to generate.  For example, Latal

said in a January 2011 performance review (which Chevalier signed) that Chevalier was

doing a "good job" but "need[ed] improvement in closing" new business.  Latal rated

Chevalier "competent" overall but rated him "marginal" in "develop[ing] new

customer opportunities."  ECF No. 27-4 at 3-7; Chevalier Dep. 110:3-117:22.  In May

2011, Latal (who was based in Illinois) traveled to Minneapolis and told Chevalier

something to the effect of:  "The honeymoon is over.  We need you to elevate your

game."  Chevalier Dep. 81:20-82:10, 136:21-138:4.  By "elevate your game," Latal meant

bring in more new business.  *Id.*

Latal's concerns were not surprising.  Supply Technologies set a goal for

Chevalier to generate $2 million in new business during 2011, Chevalier's first full year

with the company.  Supply Technologies set that goal based on the size of Chevalier's

territory and the number of manufacturers in that territory.  By August

2011—two-thirds of the way into the year—Chevalier had brought in only $88,000 in

new business, not even five percent of his goal.  Latal wrote to Chevalier that "there are

concerns as to your satisfactory pro[gr]ess in achieving these objectives . . . ." ECF

No. 27-7 at 4; Chevalier Dep. 155:12-158:17; ECF No. 27-10 [Latal Dep.] at 36:15-38:7,

41:9-14.[1]  All of this happened before Chevalier alleges that he became disabled.

Chevalier did have some spotty success in bringing in new business.  For

example, on one occasion Chevalier received a letter of commendation from Supply

Technologies' president (Mike Justice) for significantly increasing an existing

customer's order.  ECF No. 33 [Chevalier Decl.] ¶ 16.  But Chevalier never came

remotely close to meeting his annual goals for generating new business.  In fact,

Chevalier brought in only $13,000 in new business in 2010; $454,000 in 2011; $530,000 in

2012; and $337,000 through September of 2013.  ECF No. 29-2 at 2-7.

In February 2012, Chevalier suffered a heart attack and missed 30 days of work.

Chevalier Dep. 24:17-21; Chevalier Decl. ¶ 11.  Chevalier contends that the heart attack

---

[1]Chevalier maintains that these expectations were unrealistic.  Chevalier Dep.
17:10-20, 155:12-156:9; Chevalier Decl. ¶ 10.  He may well be correct.  But it is not
unlawful for an employer to set unrealistic goals—or to fire an employee for failing to
meet those goals.  Chevalier appears to concede that Supply Technologies set unrealistic
goals for *all* of its account executives—and, as will be discussed below, Chevalier was
not the only account executive terminated for failing to meet those allegedly unrealistic
goals.  Chevalier Dep. 162:5-167:5.

limited his "ability to walk, run, lift, climb, pull, push or engage in any sudden movement or strenuous activity."  Chevalier Decl. ¶ 12.  But Chevalier does not contend that the heart attack had a material impact on his ability to sell fasteners for Supply Technologies after he returned to work.

As 2011 turned into 2012, and 2012 into 2013, Chevalier's superiors continued to monitor his success in bringing in new business, express concerns about his failure to bring in new business, and explore various ways to spur him to bring in more new business.  For example, Latal and Galla discussed creating a formal performance improvement plan ("PIP") for Chevalier, but decided to continue to monitor his sales instead.  ECF No. 27-16.  By 2012, Latal, Galla, and Justice had begun discussing terminating Chevalier.  Latal Dep. 69:13-19.  In April 2013, Slickman told Latal to withhold a salary increase for Chevalier until his performance improved.  ECF No. 27-14; Latal Dep. 77:2-23.  After more months of discussions, Justice finally decided on September 27, 2013, that Chevalier could be fired "at will."  Latal Dep. 102:10-110:7; ECF No. 28 [Justice Decl.] ¶¶ 10-12.  (Chevalier disputes that Justice made the final decision to terminate his employment, but has little evidence contradicting Justice's and Latal's accounts.)

Chevalier was not fired right away, however, apparently due to a misunderstanding between Justice and Latal.  Latal says that he was waiting for explicit

instructions about when he should execute the termination.  Latal Dep. 140:13-141:4,

154:16-155:2.  Justice apparently assumed that he had left that to Latal's judgment.

Chevalier continued to work and was even scheduled to attend a training session in

Chicago.  Chevalier missed that training session, however, because on October 12, 2013,

he suffered a TIA—sometimes called a "mini-stroke."  Chevalier Dep. 37:16-18;

Chevalier Decl. ¶¶ 19-20.  Chevalier was hospitalized for a couple of days, Chevalier

Dep. 37:19-38:7; Chevalier Decl. ¶ 19, but the TIA did not otherwise affect him in any

way.

Chevalier returned to work.  When Justice was told that Chevalier had returned

to work after a brief absence, Justice was surprised, as he assumed that Chevalier's

managers would have fired him after Justice gave them the green light on

September 27, 2013.  Justice Decl. ¶ 12.  Justice again instructed Chevalier's

managers—this time more explicitly—that they should terminate his employment.  *Id.*

¶ 13.  Justice testified that, at the time, he did not know that Chevalier had suffered a

TIA.  *Id.*

On October 24, 2013, Latal traveled to Minneapolis and told Chevalier that he

was being fired because he had failed to meet his sales goals.  Chevalier Dep. 15:22-24,

201:1-206:3; Latal Dep. 124:10-17.  Chevalier claims that he was "shocked" by the

termination.  Chevalier Dep. 209:19-24.  He maintains that other account executives

were also struggling to meet their sales goals but were not immediately fired.  He points in particular to Kari Isenhower and Michael Chu, both of whom were placed on formal PIPs after failing to meet their sales goals.  Latal Dep. 24:17-25:15, 65:6-66:25.

Although Isenhower and Chu were indeed placed on PIPs, both were also eventually terminated by Supply Technologies.  Isenhower was fired because she, like Chevalier, failed to meet her sales goals.  *Id.* at 19:19-23; Justice Decl. ¶ 14.  And Supply Technologies eliminated Chu's position after determining that the amount of potential business available in his territory (Phoenix, Arizona) did not justify a full-time account executive.  Latal Dep. 19:9-18, 66:11-25.

## II.  STANDARD OF REVIEW

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.[2]

_____

[2]Chevalier contends that Minn. Stat. § 181.963 bars Supply Technologies from relying on certain handwritten notes by Latal that were not included in the personnel

Normally, that is all that the Court would say about the law that applies to summary-judgment motions. Some elaboration is necessary here, though, because Chevalier badly misapprehends the law in a number of respects:

First, it is not true (as Chevalier argues) that, in deciding this motion for summary judgment, the Court must "discard[]" all of Supply Technologies' evidence. ECF No. 32 at 21. Instead, the Court must consider *all* of the evidence and, *when there is a conflict*, credit Chevalier's evidence over Supply Technologies'. *E.g., Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000). The Court most certainly may consider Supply Technologies' *uncontradicted* evidence.

Second, it is not true (as Chevalier argues) that the Court cannot grant summary judgment to Supply Technologies unless Chevalier has absolutely no evidence to support his claim. ECF No. 32 at 20. A defendant can win summary judgment in a case in which the plaintiff has some evidence supporting his claim if that evidence, taken as true, is nevertheless insufficient to support a jury verdict in the plaintiff's favor. And

---

file that Supply Technologies produced at Chevalier's request. *See* ECF Nos. 27-5, 27-6, 27-11, 27-15, 27-18, 27-19, 27-20, 27-21, 29-1. It is true that Minn. Stat. § 181.963 provides that any information improperly omitted from an employee's personnel record "may not be used by the employer in an administrative, judicial, or quasi-judicial proceeding." But the parties devote scant attention to the difficult question of whether this state-law rule of evidence applies in federal diversity suits. *See generally* Charles Alan Wright & Kenneth W. Graham, Jr., 22A Federal Practice and Procedure § 5201 (2d ed. 2014). The Court need not address the question, as the Court finds that Supply Technologies is entitled to summary judgment even if the handwritten notes are ignored.

this is the case even if the defendant has absolutely no evidence contradicting the plaintiff's evidence. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

Third, it is not true (as Chevalier argues) that "summary judgment should almost never be granted in discrimination cases." ECF No. 32 at 30. The Eighth Circuit—sitting en banc and ruling unanimously—has rejected this argument and abrogated the panel decisions on which this argument is based:

> The panel statements asserting a different standard of review for summary judgment in employment discrimination cases are contrary to Supreme Court precedent. The Court has reiterated that district courts should not "treat discrimination differently from other ultimate questions of fact." *Reeves*, 530 U.S. at 148, *quoting St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 524 (1993) . . . . In a landmark case, the Court wrote:

>> Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action."

> *Celotex Corp.*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1). Because summary judgment is not disfavored and is designed for "every action," panel statements to the contrary are unauthorized and should not be followed. There is no "discrimination case exception" to the application of summary judgment, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial.

*Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (en banc); *see also id.* at 1054 (Smith, J., concurring in part and dissenting in part) ("I concur in the court's holding[] that . . . '[t]here is no "discrimination case exception" to the application of

summary judgment' . . . .  Our circuit has maintained cautionary language for handling discrimination cases for a generation.  This language probably should not have survived the mid-eighties as there is no 'discrimination case exception' to the summary judgment standard for employment discrimination cases.").

Finally, it is not true (as Chevalier argues) that the *McDonnell Douglas* analysis (discussed below) is inconsistent with the summary-judgment standard.  ECF No. 32 at 25-29.  To the contrary, that analysis has been undertaken on countless occasions by the United States Supreme Court, the Eighth Circuit, and every other federal court in deciding whether to grant—or whether the district court should have granted— summary judgment to an employer on a discrimination claim.  *See, e.g., Macklin v. FMC Transp., Inc.*, 815 F.3d 425, 427-28 (8th Cir. 2016).

### III.  ANALYSIS

The Minnesota Human Rights Act forbids an employer from discharging an employee because of the employee's disability.  *See* Minn. Stat. § 363A.08, subd. 2. Chevalier does not have direct evidence that he was terminated because of a disability, and therefore his discrimination claim must be analyzed under the burden-shifting framework described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Dovenmuehler v. St. Cloud Hosp.*, 509 F.3d 435, 439 n.4 (8th Cir. 2007) (explaining that federal precedent may be used when applying the MHRA).

To establish a prima facie case of discrimination under *McDonnell Douglas*, Chevalier must show that he "(1) is a member of a protected class, (2) was qualified, (3) suffered an adverse employment action, and (4) can provide facts that give rise to an inference of unlawful . . . discrimination." *Butler v. Crittenden Cty.*, 708 F.3d 1044, 1050 (8th Cir. 2013).  Once Chevalier establishes a prima facie case of discrimination— which, for the sake of argument, the Court will assume that he has—the burden shifts to Supply Technologies to articulate a legitimate, nondiscriminatory reason for firing Chevalier.  *See Canady v. Wal-Mart Stores, Inc.*, 440 F.3d 1031, 1034 (8th Cir. 2006).  Here, Supply Technologies met its burden by asserting that Chevalier was fired for poor performance.  The burden then shifts back to Chevalier to cite sufficient evidence in the record to support a jury verdict that Supply Technologies' articulated reason for firing him was a pretext for disability discrimination.  *Id.*

The two most common ways that plaintiffs prove pretext (in the absence of direct evidence of discrimination) are comparators and temporal proximity.  Plaintiffs can show pretext by establishing that similarly situated coworkers outside of their protected class (known as "comparators") were treated more favorably.  *See Burton v. Ark. Sec'y of State*, 737 F.3d 1219, 1230-31 (8th Cir. 2013).  Plaintiffs can also show pretext by pointing to a suspiciously close temporal connection between, on the one hand, the defendant's becoming aware of protected activity or status and, on the other hand, the adverse

action.  *See Fitzgerald v. Action, Inc.*, 521 F.3d 867, 875-76 (8th Cir. 2008).  Chevalier

pursues both of these avenues.

### A.  Comparators

Chevalier focuses primarily on Isenhower as a potential comparator.  He asserts

that (1) she was outside of his protected class (i.e., she was not disabled); (2) she was

similarly situated (i.e., she, too, failed to meet her sales goals); and (3) she was treated

more leniently (i.e., she was placed on a formal PIP before being fired).  But Isenhower

is not helpful to Chevalier for at least three reasons:

First, the evidence in the record does not establish that Isenhower was not

disabled (or perceived as disabled) and thus outside of Chevalier's protected class.

Chevalier concedes that he does not know whether Isenhower had any disabling

conditions.  Chevalier Dep. 18:23-19:14.  Other employees who are in the same

protected class as the plaintiff are not effective comparators because, sharing the

plaintiff's class, they cannot demonstrate that those *outside* of the protected class were

treated better.  *See Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 957 (8th Cir. 2012) ("The

fact that Dr. Kirkendall, a member of both of Bone's protected classes, was treated more

leniently than Bone casts doubt on Bone's suggestion that the alleged lenience for [the

comparators] is evidence of pretext or prohibited bias."); *Hitt v. Harsco Corp.*, 356 F.3d

920, 925 (8th Cir. 2004) ("[E]ven assuming the 1998 incident and Hitt's altercation were

comparable . . . , one of the two employees who received this alleged leniency was aged

51, and thus a member of the protected class under the ADEA . . . .  If anything, this

evidence tends to demonstrate that Harsco applies the rule against fighting without

regard to age . . . .").

Second, it is not clear that Isenhower was in fact treated more favorably than

Chevalier.  The adverse action of which Chevalier complains is *being fired*; Isenhower

suffered exactly the same adverse action.  True, before being fired, she was placed on a

formal PIP, but she nevertheless was fired for not generating enough new business, just

as Chevalier was fired for not generating enough new business.  It is odd for a plaintiff

to cite as a comparator someone who suffered the very same adverse employment

action for the very same reason.  *See Chappell v. Bilco Co.*, 675 F.3d 1110, 1118 (8th Cir.

2012) (no pretext when, among other things, employees who had not previously filed

lawsuits were, like plaintiff, also disciplined under attendance policy); *Wells v. SCI*

*Mgmt., L.P.*, 469 F.3d 697, 701 (8th Cir. 2006) (no pretext when males were fired along

with female plaintiff).

Finally, even if Isenhower was outside of Chevalier's protected class, and even if

she could be regarded as having received more favorable treatment, she is not a proper

comparator because she was considerably better at generating new business than

Chevalier.  For example, in 2012 (the year before she was placed on a PIP), Isenhower

brought in $981,000 in new business—close to double Chevalier's $530,000.  ECF

No. 29-2 at 2.  In light of this disparity, Isenhower and Chevalier were not similarly

situated with respect to the crucial characteristic:  the ability to generate new business.

*See Fiero v. CSG Sys., Inc.*, 759 F.3d 874, 879-80 (8th Cir. 2014) (proposed comparator not

similarly situated when he improved his timeliness and had better technical skills).

Chevalier also points to Chu as a potential comparator.  But Chevalier does not

dispute that Chu lost his job because his position was eliminated after Supply

Technologies determined that his territory was not viable.  By contrast, Chevalier lost

his job because of his inability to generate sufficient new business in a territory that was

viable.  For this reason—as well as the other reasons given with respect to

Isenhower—Chu is not a proper comparator.

### B.  *Timing*

Chevalier also asserts that the timing of his firing supports a finding of pretext.

The Court disagrees.

Chevalier suffered the heart attack in February 2012.  But he was not fired until

*20 months* later.  Twenty months is an eternity in employment law.

Chevalier suffered the TIA less than two weeks before he was fired.  The problem for Chevalier, however, is that he was fired at the direction of Justice, and there is no evidence contradicting Justice's sworn testimony that (1) he decided to fire Chevalier two weeks *before* Chevalier's TIA, and (2) he reaffirmed his decision without knowing of that TIA.

Chevalier claims that Justice was not the real decisionmaker, but Chevalier does not have sufficient evidence to persuade a reasonable jury to agree with him.  And even if Chevalier had such evidence, there is simply nothing in the record—not in Chevalier's file, not in the email correspondence, not in the testimony of Chevalier's supervisors, and not even in Chevalier's own testimony—that suggests that any of Chevalier's supervisors cared one whit about his heart attack or TIA.  The record contains a great deal of evidence about communications between Chevalier and his managers—and about communications among Chevalier's managers about Chevalier—and not one of those communications even hints at animus based on disability.  To the contrary, everything in the record indicates that Chevalier's supervisors were focused (even to the point of obsession) on generating new business, and that their one and only concern about Chevalier was that he was falling far short of his new-business goals.

Also undermining any inference of suspicious timing is the fact that Chevalier offers no evidence that the TIA had any impact on him, save the need to spend a couple of days in the hospital.  It would be passing strange if, for 20 months, Supply Technologies ignored Chevalier's heart attack (which caused him to miss 30 days of work, and which had lasting consequences), only to fire him for the TIA (which caused him to miss three days of work and had no lasting consequences).

For these reasons, the Court concludes that a reasonable jury could not find that Supply Technologies' explanation for firing Chevalier is pretextual.  The Court therefore grants Supply Technologies' motion for summary judgment.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT:

1.      Supply Technologies' motion for summary judgment [ECF No. 24] is

GRANTED.

2.      This action is DISMISSED WITH PREJUDICE AND ON THE MERITS.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Date:  October 12, 2016              s/Patrick J. Schiltz
                                     Patrick J. Schiltz
                                     United States District Judge